# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ROBERT BOEHL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 04 C 5606 |
| | ) |
| ANTHONY DELUCA and CITY OF | ) Judge Rebecca R. Pallmeyer |
| CHICAGO HEIGHTS, a municipal | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Boehl, a former supervisor in the Public Works Department of the City of Chicago Heights ("Chicago Heights" or the "City"), brings this action under 42 U.S.C. § 1983 against Chicago Heights and Mayor Antony DeLuca (collectively, "Defendants"). Boehl alleges that Defendants violated his First Amendment rights by terminating him in retaliation for his support of a rival mayoral candidate. Defendants have moved for summary judgment on Boehl's claim, and for the reasons explained below, Defendants' motion is granted.

## FACTUAL BACKGROUND[1]

### A.    The Chicago Heights Mayoral Election of 2003

In November 2002, Angelo Ciambrone, mayor of Chicago Heights since 1995, decided not to seek another term. (Def.'s 56.1 ¶¶ 19-20.) Several candidates entered the subsequent mayoral

---

[1]    Facts presented here are taken from the parties' Local Rule 56.1 statements and attachments. Defendant's [sic] Local Rule 56.1 List of Material Facts to Which They Contend There Is No Genuine Issue is cited here as "Def.'s 56.1." Plaintiff's Response to Defendant's [sic] Local Rule 56.1(a)(3) Statement of Facts and Plaintiff's Statement of Additional Facts Which Support the Denial of Summary Judgment is cited as "Pl.'s 56.1 Resp." Defendants' Response to Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Def.'s 56.1 Reply."

The court notes that Defendants, without seeking leave of this court, have filed a Local Rule 56.1 statement of facts containing 312 paragraphs, in violation of the Rule's eighty-paragraph limit. See N.D. Ill. R. 56.1(a). It appears that Defendants, in preparing summary judgment motions in other lawsuits involving other former Chicago Heights employees, submitted the same Local Rule 56.1 materials in each case. The court disregards the parties' assertions to the extent they are relevant only to those other employees' suits.

race, including Ciambrone's chief of staff Paulnita Rees, David Zerante, Defendant DeLuca, and three others. (*Id.* ¶¶ 20-21.) In Chicago Heights, candidates for elected office run under nonpartisan organizational names, such as "Renaissance," "FUEL," and "Change." (*Id.* ¶ 17.) DeLuca ran as the "Change" candidate. (*Id.* ¶ 18.)

One of the key issues in the 2003 mayoral campaign was Chicago Heights' growing financial crisis. (*Id.* ¶ 49.) During the Ciambrone administration, employee salaries and benefits constituted one of the major expenses of the City's budget. (*Id.* ¶ 38.) Employee health care costs were rising dramatically; Stacie Foster, a Human Resources employee who dealt with City employees' health insurance issues, asserted those costs were "'killing'" the City. (*Id.* ¶ 39 (quoting S. Foster Dep., Ex. 19 to Def.'s 56.1, at 107).) At the same time, revenue was declining due to losses in commercial business and in the City's industrial base. (*Id.* ¶ 52.) Ciambrone had attempted to bring new businesses to Chicago Heights and to convince existing businesses to stay, but these efforts were insufficient to cure the City's budget crisis. (*Id.* ¶¶ 41, 43.) In March 2002, City Treasurer Joan Bauer projected a deficit of more than $3.7 million for the fiscal year 2002-2003. (*Id.* ¶ 45.)

Each of the candidates in the 2003 mayoral campaign offered a different solution to Chicago Heights' financial problems. Rees proposed bringing new business into the City, rather than cutting expenses, and Zerante said he would try to "redo" outstanding municipal bonds. (*Id.* ¶ 50 (citing Rees Dep., Ex. 23 to Def.'s 56.1, at 52-53).) DeLuca promised to "run [the City] like a business." (*Id.* (quoting Zerante Dep., Ex. 28 to Def.'s 56.1, at 83).) All the candidates acknowledged that in order to maintain financial stability, they would at some point be forced to reduce the City's payroll. (*Id.* ¶ 53 (citing Foster Dep., Ex. 18 to Def.'s 56.1, at 383).)

Rees entered the race in order to run against Zerante, (*id.* ¶ 22), whom she did not trust due to a poor experience working with him when Zerante was an alderman, (*id.* ¶ 31), and who had made her "very angry" at times. (Rees Dep., at 130-31.) Rees did not view herself as running

against DeLuca. (Def.'s 56.1 ¶ 22.) In a February 2003 "run-off" primary to choose two candidates for the general election, Zerante and DeLuca received the most votes. (*Id.* ¶ 25.) Both then asked for Rees' support. (*Id.* ¶ 26.) Rees told DeLuca and others that she could not support Zerante because she did not trust him. (*Id.* ¶¶ 29-31.) Nonetheless, a week before the general election, in April 2003, Rees, in a letter to the editor of the local newspaper, wrote that she would vote for Zerante because she was a registered Democrat.[2] (*Id.* ¶ 33.)

DeLuca won the April 2003 general election, and was sworn in as mayor of Chicago Heights on May 5, 2003. (*Id.* ¶¶ 2, 19.) The following day, DeLuca's campaign manager Dan Proft replaced Rees as chief of staff. (*Id.* ¶ 62, 64.) Rees characterized her termination meeting with DeLuca as "'very cordial, very nice, no problem.'" (*Id.* ¶ 63 (quoting Rees Dep., Ex. 23 to Def.'s 56.1, at 67).)

In the month preceding DeLuca's taking office, DeLuca and Proft had investigated and gathered information about the financial health of the City. (*Id.* ¶ 60.) DeLuca viewed the situation as "grim. . . . financially, operationally, and developmentally." (*Id.* (quoting DeLuca Dep., Ex. 17 to Def.'s 56.1, at 18-19).) Proft predicted a $4 million deficit for the fiscal year 2003-2004. (*Id.* ¶ 61.) On May 23, 2003, City Treasurer Bauer, in a memo to DeLuca, informed the new mayor that the City had posted a $2 million deficit for 2002-2003 and warned that "[s]pending must continue to be curtailed" because the new budget was "still $4 [million] short."[3] (*Id.* ¶ 65; Memo from Bauer to

---

[2]    Although candidates run under nonpartisan names, traditional partisan affiliations have not been abandoned in Chicago Heights. Ciambrone was a longtime and active member of the Democratic Party, (Ciambrone Aff. ¶¶ 2-3, Ex. 7 to Pl.'s 56.1), and the parties note in their briefs that DeLuca was a Republican and Zerante a Democrat. (Defendants' Memorandum in Support of Summary Judgment ("Def.'s Mem."), at 3; Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment ("Pl.'s Resp."), at 2.) Although a registered Democrat, Rees ran for mayor as an independent, with support from both Republicans and Democrats. (Def.'s 56.1 ¶ 23.)

[3]    Although Boehl objects to this memo as hearsay, (Pl.'s 56.1 ¶ 65), the document is not, in the court's view, offered to prove the amount of Chicago Heights' budget deficits but to show the effect of this news on DeLuca. As the memo is not offered to prove the truth of the matters therein, it is not hearsay. *See* FED. R. EVID. 801(c).

DeLuca of May 23, 2003, Ex. 9 to Def.'s 56.1, at CH 1021.)  The DeLuca administration viewed the deficit as caused by, among other things, a large number of municipal employees and employees with duplicative jobs.  (Def.'s 56.1 ¶ 67.)

According to Defendants, DeLuca "immediately began to attempt to identify and trim the employee roster of positions that could be absorbed by present personnel."  (*Id.* ¶ 68.)  Boehl admits only that employees were terminated, and asserts that DeLuca also hired several new employees after becoming mayor.  (Pl.'s 56.1 ¶ 68.)  The parties agree that because many Chicago Heights employees were covered by union contracts, it was easier and less restrictive to eliminate non-union positions.  (Def.'s 56.1 ¶¶ 69-70.)  By April 2005, the City employed thirty-four fewer employees than it had in April 2003, reducing the number of employees from 318 to 284.[4]  (*Id.* ¶¶ 226-27.)  According to Defendants, this resulted in savings of $1 to $2 million.[5]  (*Id.* ¶ 229.)

---

[4]     Boehl purports to deny this assertion as unsupported by documentation.  (Pl.'s 56.1 ¶¶ 226-27.)  Defendants support their assertion with the affidavit of Lyn Bruni, the Director of Human Resources for Chicago Heights, who states that the City had 318 employees in April 2003 and 284 in April 2005, not counting the mayor, aldermen, and library employees.  (Bruni Aff. ¶10, Ex. 6 to Def.'s 56.1.)  As Boehl presents no evidence to counter Bruni's affidavit, the court deems undisputed Defendants' assertions concerning the net decrease in the number of City employees.

[5]     Boehl denies this assertion, contending that Defendants' estimates do not include the expense of (unidentified) "staff additions."  (Pl.'s 56.1 ¶ 229.)  Defendants cite to Bruni's deposition and exhibits thereto, in particular a document titled "Staff Adjustment Effects (Annualized)", dated July 14, 2004, that lists salary and estimated benefits for terminated employees under headings of "Staff RIFs" and "Police RIFs", and for new hires under the heading of "Staff Additions", arriving at a total "RIF Savings" of $1,364,357.40.  (Ex. 1 to Bruni Dep., Ex. 14 to Def.'s 56.1, at CH 884-85.)  Bruni testified that this document was prepared by the City treasurer in response to litigation by terminated employees, and listed not only employees who had "been riffed" but also those who had left, retired, or resigned and had not been replaced.  (Bruni Dep., at 23-25, 119-20.)  A second copy of this document, not cited by Defendants, contains handwritten corrections, particularly in the "Staff Additions" section where many names are crossed off.  (Ex. 1 to Bruni Dep., at CH 886-87.)  Defendants do not explain who made these corrections, or when, or their meaning; the court notes that the corrections may explain why Defendants have not been more precise in their estimates of cost savings.  Defendants also cite to an undated and untitled document that totals salary and benefit expenses for employees with termination dates between May 2003 and November 2004, for a "Total Wage & Benefits" of $2,163,516.  (Ex. 1 to Bruni Dep., at CH 957, 957A.)  Absent more information, this document is less helpful.
Boehl cites to no evidence of his own to support his challenge of Defendants' assertion of
(continued...)

## B. Boehl's Employment and Termination

An initial target of the DeLuca administration was the Public Works Department, which Ciambrone had created in 1999 to oversee several other municipal departments, including the Water Department, the Streets & Sewers Department, and the Maintenance Department.[6] (*Id.* ¶ 74; Pl.'s 56.1 ¶ 144.) Ciambrone had appointed Douglas Foster, who had been the Superintendent of the Water Department, as Director of the Public Works Department in 2000. (Def.'s 56.1 ¶¶ 72-74.) Foster earned one of the highest salaries in the City. (*Id.* ¶ 76.)

Plaintiff Boehl began working for Chicago Heights in 1983 as a laborer in the Water Department. (*Id.* ¶ 132.) He left to work for a private company in 1987, (*id.*), but was rehired in 1995 in the same position, (*Id.* ¶ 133), and, in 1997, became a foreman in the Water Department. (*Id.* ¶ 134.) In 2001, Boehl became a supervisor in the newly-created Public Works Department. (*Id.* ¶¶ 135-36.) His duties in that position included advising Foster, relaying information to Foster from the other department heads, filling in for the individual department heads when they were absent, operating equipment if there were manpower shortages, reprimanding employees, and speaking with unions. (*Id.* ¶ 137; Pl.'s Dep., Ex. 13 to Def.'s 56.1, at 115-17.) In his deposition, Boehl testified that he was "a jack-of-all trades." (Pl.'s Dep., at 116.)

After the 2003 mayoral election, the DeLuca administration determined that Foster's responsibilities and those of the Public Works Department were duplicative of other departments and that the work could be absorbed by those other departments. (Def.'s 56.1 ¶ 75.) Foster was

---

[5](...continued)
cost savings; although Defendants surely could have been more precise in their estimates, the court finds that assertion adequately supported and undisputed. The court further notes that contrary to Boehl's (unsupported) assertion, the "Staff Adjustment Effects" document indeed takes into account the expense of staff additions.

[6]     Proft testified that he and DeLuca had agreed that the Public Works Department was an "unnecessary level of bureaucracy" and therefore an "obvious place to start eliminating the head count and start saving money on the personnel side of the City budget." (Proft Dep., Ex. 22 to Def.'s 56.1, at 82.)

terminated during the first week of the new administration, and the position of Director of Public Works was eliminated. (*Id.* ¶¶ 77, 80.) Eventually, DeLuca created three positions: Director of Water, Director of Streets & Sewers, and Director of Maintenance. (*Id.* ¶ 80.) Before Ciambrone's creation of the Public Works Department and Foster's appointment as its Director in 2000, the heads of these departments had been titled "Superintendents."[7] (*Id.*)

In late May 2003, Proft told a meeting of Public Works Department supervisors and department heads, including Boehl, that the new administration would be making changes but wanted to keep "key people." (*Id.* ¶ 138; Pl.'s Dep., at 124-25.) While the administration evaluated departments, Boehl temporarily was made head of the building maintenance department.[8] (Def.'s 56.1 ¶ 140.) The DeLuca administration received "mixed reviews" concerning Boehl's supervisory skills during this evaluation period.[9] (*Id.* ¶ 141 (citing Proft Dep., at 86-88).) In July 2003, Boehl

---

[7]     It is unclear whether DeLuca created three wholly new positions, or whether he merely re-named existing department heads "Director." The latter appears more likely; there is no evidence that Ciambrone had eliminated department heads when creating the Public Works Department and installing Foster as its director, and Boehl, as noted, testified that his duties included relaying information from and filling in for "other department heads," including the "department heads" of the water, sewer, and maintenance departments. (Pl.'s Dep., at 115-16.)

[8]     Although Defendants assert that Boehl was made Acting Water Department head before becoming the temporary head of the Building/Maintenance Department, (Def's 56.1 ¶ 139), there is conflicting evidence of this. Proft testified in his deposition that "we made [Boehl] Acting Director of Water." (Proft Dep., at 83.) Boehl testified that at the May 2003 meeting with department heads and supervisors, Proft initially asked Boehl to temporarily head the Water Department; after another Water Department employee with more seniority than Boehl "started to cry," however, Proft assigned Boehl to building maintenance. (Pl.'s Dep., at 127-28.) Boehl recalls protesting to Proft that building maintenance was "the girlie department." (*Id.* at 128.)

It is also unclear whether Boehl's temporary appointment as a department "head", (Def.'s 56.1 ¶ 140), carried the title of "Director." As noted, DeLuca eventually restructured Chicago Heights' public works departments to create three "Director" positions; but it is unclear whether this title was in use during the period in which the DeLuca administration was evaluating the departments and making temporary appointments such as Boehl's.

[9]     Proft testified that Boehl "was very proud of his own performance. He made that clear. And the reaction from other individuals that worked in Public Works with him, under him or over him was mixed." (Proft Dep., at 87.) Although Proft testified that he had "receive[d]" these reactions from others, (*id.*), he did not indicate whether they communicated these concerns directly

(continued...)

recalls, Proft told him that Harold Fosten would become the head of building maintenance. (Pl.'s Dep., at 135-137.) Proft did not tell Boehl what his position would be after Fosten took over. (*Id.* at 135-36.) According to Boehl, Proft told him to "keep [his] head low" as Proft tried to find a different position for Boehl, perhaps operating a backhoe. (*Id.* at 136.)

Proft advised Boehl of his termination on August 5, 2003. (Def.'s ¶ 143; Proft Dep., at 88-89.) According to Defendants, Boehl was terminated because the work performed by the Public Works Department was duplicative of work performed by other departments. (Def.'s 56.1 ¶ 144.) Boehl denies this; citing to his deposition testimony, he asserts that the Public Works Department was created "for better communication and integration of personnel," and that his job as a supervisor entailed "taking the reins and making sure the water, sewers, and streets were maintained the way the city wanted them maintained . . . ." (Pl's 56.1 ¶ 144 (citing Pl.'s Dep., at 110-16, 135-37).) Defendants further assert that no one replaced Boehl. (Def.'s 56.1 ¶ 144.) Boehl purports to dispute this assertion by noting that Harold Fosten replaced him as head of building maintenance. (Pl.'s 56.1 ¶ 144.) Boehl admits, however, that his assignment to the building maintenance position was temporary, (*id.* ¶¶ 139-40; Pl.'s Dep., at 128-30); moreover, both Boehl and Proft testified that at Boehl's termination meeting with Proft on August 5, 2003, Proft told Boehl that his position as a public works supervisor was being eliminated. (Pl.'s Dep., at 146-48; Proft Dep., at 89.)

The parties dispute whether Boehl was offered a different position. Boehl asserts that he asked Proft during the termination meeting about returning to work as a foreman, and Proft replied

---

[9](...continued)
to him. He further testified that DeLuca "had information based on what some of the other department heads had to say about his performance, who either previously or currently were working with him." (*Id.* at 86-87.)

Boehl does not object to Defendants citing Proft's testimony concerning mixed reviews of Boehl's performance, which, the court notes, would be hearsay if indeed offered to prove the quality of that performance.

that the City was "not hiring at this time." (Pl.'s 56.1 ¶ 142 (citing Pl.'s Dep., at 147-48).) According to Defendants, however, Proft had asked the union whether Boehl could return to work as a foreman at his current rate of pay, but the union had advised him that Boehl would have to start over at an entry-level laborer position. (Def.'s 56.1 ¶ 142; Proft Dep., at 89-90.) Defendants assert that Proft offered the entry-level position to Boehl, and he rejected it. (Def.'s 56.1 ¶ 142; Proft Dep., at 90.) In November 2003—three months after Boehl's termination—Boehl asserts that "there was a job posting for a working foreman in the street department."[10] (Pl.'s 56.1 ¶ 79.)

For many of the terminated employees, the DeLuca administration extended heath benefits, allowed employees to remain on the payroll until retirement benefits were vested, and/or allowed employees to use accumulated sick leave. (Def.'s 56.1 ¶¶ 206, 212-18.) When Boehl was terminated in August 2003, he needed four more months to be eligible for retirement benefits. (*Id.* ¶ 208.) The administration allowed Boehl to remain on the employee roster until January 15, 2004, in order for him to be eligible for his pension. (*Id.*) In addition, the City granted his request for an extension of health benefits because of medical issues with a child. (*Id.* ¶ 212.)

## C.    Boehl's Political Activities

It is undisputed that Boehl, a registered Republican since 1976, (*id.* ¶ 256), does not consider himself very "'political.'"[11] (*Id.* ¶ 250 (quoting Pl.'s Dep., at 170).) He never supported Democratic mayor Ciambrone in any election, but his "support" for Ciambrone's opponents consisted only of voting for those candidates. (*Id.* ¶ 251.) Boehl supported DeLuca in the 2003

---

[10]    Defendants have not responded to this assertion. Boehl cites to a document entitled "Job Posting—Working Foreman (Street Department)" that lists qualifications and requests resumes by November 13, 2003. (Job Posting, Ex. 2 to Bruni Dep., Ex. 1 to Pl.'s 56.1.) The document itself is undated, and Boehl provides no evidence indicating when or how it was posted, or whether or when it was filled.

[11]    When asked in his deposition if he knew when the 2003 primary election for Chicago Heights mayor had occurred, Boehl answered that he did not, stating "I'm not real political on stuff like that, registered voter, but not real politics." (Pl.'s Dep., at 170.)

election, and once again, his vote was the extent of his support.  (*Id.* ¶ 252.)  He did not attend a candidate fundraiser during the 2003 mayoral campaign, nor did he display campaign signs on his property or attend any of the debates between the candidates.  (*Id.* ¶ 253.)  In his deposition, he testified that he recalled none of the issues in the 2003 campaign, nor the name of DeLuca's (nonpartisan) campaign organization, nor any candidate's campaign promises.  (*Id.* ¶ 254 (citing Pl.'s Dep., at 173-74).)  Because he had voted in Republican primaries, Boehl assumed that DeLuca knew that Boehl was a registered Republican and that he had in fact supported DeLuca in 2003.[12]  (*Id.* ¶ 256; Pl.'s Dep., at 174.)  Boehl further testified that other than the fact that he was a registered Republican, he does not "have any facts or any knowledge to indicate that [DeLuca or Proft] know who [Boehl] supported in the 2003 election."  (*Id.* at 174-75.)

Despite the above assertions, none of which he contests, Boehl asserts that he worked at Rees' campaign headquarters in 2003, (Pl.'s 56.1 ¶ 315), and that he made financial contributions to her campaign.  (*Id.* ¶ 316.)  Boehl does not cite to his deposition testimony to support these assertions, nor does he point to any portion of that testimony as containing any indication of his alleged support for Rees.  Instead, he cites only to Rees' affidavit, which includes Boehl's name in a list of nine people who Rees states were among the "many individuals" that worked at her headquarters and gave money to her campaign.  (Rees Aff. ¶¶ 4-5, Ex. 4 to Pl.'s 56.1.)  In her deposition, however, when asked if Boehl supported her or Zerante in the 2003 election, Rees answered "[Boehl] was at my fundraiser, but he did not—he was not backing my campaign headquarters."  (Rees Dep., Ex. 5 to Def.'s 56.1 Reply, at 127.)  She did not explain and was not asked what she meant by "backing [her] campaign headquarters."  Rees' and DeLuca's campaign headquarters were located in the same shopping center.  (Pl.'s 56.1 ¶ 344.)

---

[12]  Boehl does not explain how DeLuca would know that Boehl had voted in Republican primaries, testifying merely that "in the primary I vote for, you know, you claim yourself."  (Pl.'s Dep., at 174.)

**D.** **Other Terminated, Promoted, and Newly-Hired Employees**

Boehl asserts that several of the employees whom DeLuca terminated either worked at Rees' campaign headquarters or had not been seen at DeLuca's campaign headquarters; conversely, DeLuca promoted employees who did work at his headquarters, and hired new employees who had not worked at Rees' headquarters. Specifically, Boehl asserts that he, Director of Public Works Foster, Human Resources employee Stacie Foster,[13] Director of Community Affairs Deborah Harper, and part-time real estate consultant Rita Starkey all worked at Rees' headquarters and were terminated by DeLuca. (Pl.'s 56.1 ¶ 315.) Of these employees, Defendants dispute only that Boehl worked at Rees' headquarters, although Defendants note that Starkey testified in her deposition that she did not outwardly support any candidate, did not vote in the run-off primary, and voted for DeLuca in the general election. (Def.'s 56.1 Reply ¶ 315 (citing Starkey Dep., Ex. 24 to Def.'s 56.1, at 25-26).) Like Boehl, Starkey made no mention in her deposition of her alleged work at Rees' headquarters. Boehl additionally highlights the fact that Proft does not recall having seen Purchasing Agent Maria Zerante (no relation to mayoral candidate David Zerante), who was terminated on May 8, 2003, (Def.'s 56.1 ¶¶ 157-58, 160-61), at DeLuca's campaign headquarters. (Pl.'s 56.1 ¶ 333 (citing Proft Dep., at 39).) Similarly, DeLuca did not see terminated Community Policing Liaison Licia Alcazar at his headquarters.[14] (*Id.* ¶ 347 (citing DeLuca Dep., at 42).)

Boehl contrasts these terminations with the more favorable treatment accorded Harold Fosten, who became Director of building maintenance after Boehl's temporary tenure as head of

---

[13]     As Stacie Foster in her deposition refers to her husband as "Doug," the court infers that she and Douglas Foster are married. (S. Foster Dep., at 61-62.)

[14]     Boehl also asserts that DeLuca never saw Community Policing Liaison Debra Stewart, who also was terminated, at his headquarters. (Pl.'s 56.1 ¶ 346.) This is unsupported, however, as DeLuca in fact testified that he did not know Stewart and thus could not know if she was ever at his headquarters. (DeLuca Dep., at 36.)

that department, and Larry Prisco, who became Director of streets and sewers.[15] (Pl.'s 56.1 ¶¶ 79, 367.) Rees observed campaign signs showing support for DeLuca in front of Fosten's home, (*id.* ¶ 318), and saw Prisco at DeLuca's campaign headquarters. (*Id.* ¶ 320.) DeLuca saw Fosten at his headquarters. (*Id.* ¶ 343.) Boehl further highlights new employees hired by DeLuca, particularly Matt Fares, who replaced Maria Zerante, (Def.'s 56.1 ¶ 163), and whom Proft saw at DeLuca's headquarters. (Pl.'s 56.1 ¶ 334.) Christina Popolla and Kaz Rosetto were hired into the clerk's office, and Michelle Smado into the police department, (*id.* ¶¶ 68, 350, 355, 358); Boehl does not assert that they worked for DeLuca or were seen at his headquarters, but rather asserts that they had not worked for Rees. (*Id.* ¶¶ 68, 317.) Defendants do not dispute this assertion, which Boehl supports with Rees' affidavit that identifies forty-one individuals who had neither worked at her headquarters nor made a financial contribution to her campaign. (Rees Aff. ¶ 6.)

Finally, Boehl asserts that DeLuca hired four other employees: Glenda Gray, Nancy DiGiovanni, Joe Kurda, and Nazereno Leli.[16] (Pl.'s 56.1 ¶¶ 353, 356-57.) Kurda and Leli were hired in 2005 in the Economic Development Department, which DeLuca created at some (unidentified) point after becoming mayor. (*Id.* ¶ 353; Bruni Dep., Ex. 2 to Def.'s 56.1 Reply, at 50-51, 66-67, 121.) Boehl makes no assertions with regard to these employees' political activities.

---

[15]     Boehl, citing to his deposition, asserts that Prisco became head of "two departments, streets and sewers." (Pl.'s 56.1 ¶ 367 (citing Pl.'s Dep., at 130).) This appears incorrect: DeLuca referred to Prisco as Director of one department, "Streets and Sewer", (DeLuca Dep., Ex. 1 to Def.'s 56.1 Reply, at 75-76), and it undisputed that at some point after DeLuca's election and subsequent reorganization of the City's public works departments, "Streets & Sewers" was one department, the other two being Water and Maintenance. (Def.'s 56.1 ¶ 80.)

[16]     Defendants deny that Gray, an attorney, was a new hire, and assert that she had been a City employee since she was hired in 1995 to prosecute traffic violations. (Def.'s 56.1 Reply ¶ 356.) Boehl cites to Bruni's deposition, in which she identifies "Paula Gray" in a list of staff additions after DeLuca's election, but testifies that "Glenda Gray" was the correct name. (Bruni Dep., Ex. 1 to Pl.'s 56.1, at 64-66.) Defendants attach Bruni's affidavit, which states that her testimony was mistaken, and that she now recalls that Glenda Gray had been an employee since 1995. (Bruni Aff. ¶ 5, Ex. 6 to Def.'s 56.1 Reply.) Defendants also attach a payroll record from April 2003 that lists Glenda Gray's hire date as October 16, 1995. (Ex. A to Bruni Aff., Ex. 6 to Def.'s 56.1 Reply.) The court need not resolve this dispute.

E.      **Boehl's Lawsuit**

On August 26, 2004, Boehl filed a one-count complaint under § 1983, alleging that his termination violated his First Amendment rights.  Specifically, Boehl alleged that "the real reason" he was terminated was that DeLuca believed Boehl had supported former mayor Ciambrone, and that DeLuca believed that Boehl "supported Democrats."  (Compl. ¶¶ 15-16.)  Responding to Defendants' motion for summary judgment, however, Boehl now maintains that he "was an active supporter of Ms. Rees" in the 2003 mayoral election, and that DeLuca was aware of that support. (Pl.'s Resp., at 6-7.)  Boehl argues that this "protected conduct of supporting Democrats was a substantial or motivating factor in [DeLuca's] decision to fire him."  (*Id.* at 8.)

Defendants have moved for summary judgment.  They argue that Boehl has not shown that DeLuca was aware of Boehl's political affiliation or support, that Boehl's political activity was a substantial or motivating factor in the decision to terminate him, or that Defendants' stated reason for Boehl's termination—Chicago Heights' fiscal crisis—is a pretext for political retaliation.[17] (Def.'s Mem., at 7-11.)

---

[17]      Several other terminated Chicago Heights employees filed lawsuits in this district against the City, Proft, and/or DeLuca, alleging, *inter alia*, political retaliation.  The court denied defendants' motion for summary judgment on Douglas Foster's § 1983 claim against DeLuca and the City.  *See Foster v. DeLuca*, No. 04 C 5850, 2006 WL 1980197, at *5 (N.D. Ill. July 7, 2006) (Norgle, J.).  The court granted summary judgment for defendants on a claim brought by Betty Halperin, a secretary in the Planning and Zoning Department, against Proft, DeLuca, and the City; the court found no evidence that DeLuca or Proft knew who she had supported in the 2003 election. *See Halperin v. DeLuca*, No. 04 C 7314, 2006 WL 2331097, at *3 (N.D. Ill. Aug. 10, 2006) (Aspen, J.).  Stacie Foster's suit against DeLuca and the City was dismissed on grounds that she failed to allege that DeLuca was personally involved in her termination or that the City had an unconstitutional policy or custom; that ruling is on appeal.  *See Foster v. Deluca*, No. 04 C 5220, 2005 WL 43257, at *2 (N.D. Ill. Jan. 7, 2005) (Der-Yeghiayan, J.).  Maria Zerante's claim against DeLuca and Proft is pending.  *See Zerante v. DeLuca*, No. 05 C 2421 (N.D. Ill. filed April 22, 2005).

## **DISCUSSION**

**I.      Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When considering a motion for summary judgment, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 666-67 (7th Cir. 2005). The court is not, however, required to "'draw every conceivable inference from the record.'" *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Moreover, the nonmoving party "must offer something more than a 'scintilla' of evidence to overcome summary judgment." *Roger Whitmore's*, 424 F.3d at 667 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, the evidence must be "'such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

## II.     Boehl's Claim of Political Retaliation

As a general proposition, "public employees may not be made to suffer adverse job actions because of their political beliefs." *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990); *Elrod v. Burns*, 427 U.S. 347 (1976)). It is thus "well established that hiring, firing, or transferring government employees based on political motivation violates the First Amendment," with certain exceptions for employees in policymaking or confidential positions. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). To make out a prima facie case for this constitutional violation, a plaintiff must demonstrate two things: first, that his conduct was constitutionally protected; and second, that this protected conduct "was a substantial or motivating factor in the employment decision." *Id.* (citing *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 495 (7th Cir. 2002); *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998)). If the plaintiff makes this prima facie showing, the burden shifts to the defendant to demonstrate a legitimate,

nonpolitical reason for the decision. *Id.* (citing *Simmons*, 289 F.3d at 495; *Nelms*, 153 F.3d at 818).

## A. Prima Facie Case

Defendants do not contend that Boehl had a policymaking or confidential position, nor do they argue that Boehl's alleged support for any candidate in the Chicago Heights mayoral election does not constitute protected activity. *See Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (noting no dispute that plaintiff's endorsement of and support for a mayoral candidate was protected by the First Amendment). Boehl thus must prove by a preponderance of the evidence that his alleged support of Rees was a substantial or motivating factor in the decision to terminate him. *See Nelms*, 153 F.3d at 818 (citing *Garrett*, 961 F.2d at 632); *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981). The Seventh Circuit has observed that this "'burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election.'" *Nelms*, 153 F.3d at 818 (quoting *Nekolny,* 653 F.2d at 1168). In other words, "[i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers . . . ." *Hall*, 389 F.3d at 762. For Boehl to prove that his political activities were a substantial or motivating factor in Defendants' decision to terminate him, he "must first prove that [Defendants] in fact knew of them." *Garrett*, 961 F.2d at 632 (citing *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079 (7th Cir. 1992)); *Nelms*, 153 F.3d at 819; *see Hall*, 389 F.3d at 762 (noting that "the threshold question" in analyzing whether an employment decision was motivated by the plaintiff's political activities "is whether the defendants even knew about" those activities); *see also Winkelman v. Magne*, 173 F. Supp. 2d 821, 825 (C.D. Ill. 2001) ("The law is clear that, if a defendant does not know of a plaintiff's political affiliation (or lack thereof), he cannot be held liable for violating that plaintiff's First Amendment rights for basing an employment decision upon the plaintiff's political affiliation.")

### 1. Boehl's Claim of Support for Rees

Defendants argue that Boehl has presented no evidence that Defendants were aware of Boehl's alleged support for Rees, or his political affiliation in general. (Def.'s Mem., at 8-9; Defendants' Summary Judgment Reply Memorandum ("Def.'s Reply"), at 2-4.) The court agrees.

As noted, Boehl, who in his deposition testimony characterized himself as "not real political," (Pl.'s Dep., at 170), nevertheless now asserts that he was an "active supporter" of Rees in the 2003 election and had both worked at her campaign headquarters and contributed financially to her campaign. (Pl.'s Resp., at 6.) Because Rees' and DeLuca's campaign headquarters were in the same shopping center, Boehl contends that "it is reasonable to assume that Mr. DeLuca was aware of who was supporting Rees instead of him." (*Id.* at 7.) Moreover, Boehl points out that Rees had been the chief of staff for Ciambrone, a Democrat; thus, Boehl contends, the fact that DeLuca, a Republican, knew of Boehl's support for Rees shows that DeLuca believed that Boehl supported Democrats, and that DeLuca's belief about Boehl's support for Democrats was thus a substantial or motivating factor in DeLuca's decision to terminate him. (*Id.* at 6, 8.)

Boehl's argument suffers from a number of flaws, the most glaring of which is that there is little evidence that Boehl supported Rees at all in the 2003 mayoral campaign. As noted, Boehl makes this assertion for the first time in response to Defendants' motion for summary judgment; his complaint makes no mention of Rees, and instead alleges that DeLuca terminated him because DeLuca believed that Boehl supported Ciambrone and Democrats in general. (Compl. ¶¶ 15-16.) Indeed, it is undisputed that Boehl, a registered Republican since 1976, in fact supported DeLuca in the 2003 election. (Def.'s 56.1 ¶ 252.) When asked in his deposition, "who did you support in 2003?" Boehl simply answered, "DeLuca." (Pl.'s Dep., at 172.) Boehl identifies no point in his testimony where he indicates that he supported Rees, or indeed any candidate other than DeLuca.

The only evidence Boehl cites in support of his new assertion that he supported Rees in 2003 is Rees' affidavit, in which she lists nine people, including Boehl, as being among the "many individuals" that had (1) worked at her campaign headquarters and (2) made financial contributions

to her campaign.  (Rees Aff. ¶¶ 4-5.)  Notably, Rees appears to contradict the former assertion in her deposition: she testified that Boehl "was at my fundraiser,[18] but he did not—he was not backing my campaign headquarters."  (Rees Dep., Ex. 5 to Def.'s 56.1 Reply, at 127.)  Boehl provides no explanation for this apparent conflict between Rees' deposition testimony and her affidavit.  In the court's view, the most reasonable interpretation of this testimony is that Boehl did not work at Rees' headquarters.

Boehl's assertion that he did so is inconsistent with his own deposition testimony, which suggests that Boehl was not an "active supporter" of anyone in the 2003 election.  When asked if he knew when the 2003 run-off—which ended Rees' candidacy—had occurred, Boehl answered that he did not, admitting that he was "not real political on stuff like that, registered voter, but not real politics."  (Pl.'s Dep., at 170.)  His undisputed "support" for DeLuca in 2003 consisted entirely of voting for him; he testified that he attended no fundraisers during the campaign, displayed no campaign signs, attended none of the debates, and could recall none of the issues in the campaign, nor the name of DeLuca's organization, nor any candidate's campaign promises.  (Pl.'s Dep., at 173-74.)  When asked if could "recall anything that [Rees] talked about during the election," Boehl answered, "No."  (*Id.* at 173.)  Moreover, the fact that Boehl had been a registered Republican since 1976, never supported Ciambrone in any election, and always voted for Ciambrone's opponents is inconsistent with his being an "active supporter" of Rees, who was a registered Democrat and Ciambrone's chief of staff.  In short, the undisputed evidence in the record indicates that Boehl voted for DeLuca, and supported no other candidate in the 2003 mayoral election.[19]

_____

[18]    In the portion of Rees's testimony the parties have provided, there is no further reference to this fundraiser.  The court notes that it is undisputed that Boehl attended no fundraisers during the 2003 mayoral campaign.  (Def.'s 56.1 ¶ 253.)

[19]    Boehl's competing assertions of having supported Rees and DeLuca in the 2003 mayoral election might be less troubling if Boehl asserted that he supported Rees in the primary election and DeLuca in the general election.  Boehl does not so contend, nor is there any evidence
(continued...)

## 2. DeLuca's Knowledge of Boehl's Political Activities

Even if the court were to ignore this evidence, as well as the conflict between Rees' deposition testimony and her affidavit, Boehl's assertion that he worked at Rees' campaign headquarters would not establish that DeLuca knew that Boehl supported Rees. Boehl's only evidence on this issue is the fact that Rees' and DeLuca's headquarters were in the same shopping center. But he provides no other information about this shopping center, such as its size, the location of each headquarters, or whether the two headquarters were in each other's line of sight. More significantly, he does not assert that anyone from DeLuca's headquarters ever saw Boehl at Rees' headquarters. Similarly, his assertion that he made financial contributions to Rees' campaign is immaterial, for that fact, standing alone, does not indicate that DeLuca knew about it.

Lacking any direct evidence that DeLuca knew of his alleged support for Rees, Boehl maintains that an inference can be drawn from what he deems "patterns" of terminations, hiring, and promotions that correspond with who had worked or not worked at Rees' headquarters, and who had been seen or not seen at DeLuca's. (Pl.'s Resp., at 7-8.) Boehl makes much of the fact that four employees (besides Boehl) who worked at Rees' headquarters (Deborah Harper, Doug Foster, Stacie Foster, and Rita Starkey) were terminated after the election. (*Id.* at 7.) Boehl also notes that DeLuca and Proft did not see Marie Zerante or Licia Alcazar, both of whom also were terminated, at DeLuca headquarters. (*Id.* at 7.) In contrast, Proft did see Zerante's replacement, Matt Fares, at DeLuca headquarters; DeLuca saw Harold Fosten, who became the new Director of building maintenance, at his headquarters; and Rees saw Larry Prisco, the new head of streets and sewers, there as well. (*Id.*) Finally, Boehl points out that Christina Popolla, Kaz Rosetto, and Michelle Smado, none of whom worked for Rees, were hired by DeLuca after the election. (*Id.*)

---

[19](...continued)
in the record to suggest that this was the case. Such an assertion would not, of course, explain why Boehl never mentioned his support for Rees in his deposition, nor would it resolve the conflict between Rees' affidavit and her deposition.

According to Boehl, "[t]hese patterns illustrate that Mayor DeLuca fired people . . . who did not support his campaign and hired and promoted people who did." (*Id.*) This, Boehl contends, in turn supports the inference that DeLuca knew who Rees' supporters were. (*Id.* at 8.)

An inference that DeLuca knew who supported Rees does not, however, necessarily give rise to the further inference that DeLuca gained that knowledge by observing who was working at Rees' campaign headquarters. That would be the crucial inference here, as Boehl presents no evidence of his alleged public support for Rees apart from his assertion that he worked at her headquarters. As discussed, Boehl's evidentiary support for this assertion is suspect, given that he cites only to a statement in Rees' affidavit that conflicts with her deposition testimony and is inconsistent with and unsupported by his own.

Boehl presents no other evidence to suggest that DeLuca was aware of his purported support for Rees. Indeed, when he was asked in his deposition whether he knew or had any facts to indicate that either DeLuca or Proft knew who he supported in the 2003 election, he answered: "The only fact that I can say I've been a registered republican [sic] voter since 1976, so, under my assumption, I would think Mr. DeLuca would believe I would vote for him, because in the primary I vote for, you know, you claim yourself." (Pl.'s Dep., at 174.) He admitted to having no other "facts or knowledge to indicate" that DeLuca or Proft knew who he had supported. (*Id.* at 174-75.) Of course, the fact that Boehl assumed that DeLuca believed Boehl would vote for him, is not dispositive of whether DeLuca in fact knew who Boehl supported in 2003.[20] Nonetheless, Boehl presents no other evidence to indicate that DeLuca knew of Boehl's alleged support for Rees

---

[20]    Defendants characterize this portion of Boehl's testimony as a "judicial admission" that DeLuca had no knowledge of Boehl's political activities. (Def.'s Mem., at 8.) Judicial admissions are "'not evidence at all but rather have the effect of withdrawing a fact from contention.'" *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th cir. 1995) (quoting MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6726 (Interim Edition)). The court deems Boehl's testimony an "ordinary evidentiary admission," which occurs, as here, when a party testifying at a deposition admits a fact adverse to that party's claim. *See id.*

beyond his suspect assertion of working at Rees' campaign headquarters, and strained inferences arising from the fact that Rees' and DeLuca's headquarters were in the same shopping center.[21]

The court further notes that other than Rees' affidavit, there is scant evidence that *anyone* knew of Boehl's alleged support of Rees. It is undisputed that former mayor Ciambrone does not know Boehl's political affiliation, or who Boehl supported in either the primary or general election in 2003, (Def.'s 56.1 ¶¶ 258-59); that Rita Starkey and Stacie Foster, with whom Boehl allegedly worked at Rees' headquarters, do not know which candidate he supported, (*id.* ¶¶ 257, 263); and that other employees, including Maria Zerante and Licia Alcazar, similarly lack such knowledge. (*Id.* ¶¶ 261-67.) Aside from Rees, Boehl has failed to identify a single individual who was aware of which mayoral candidate he supported in the 2003 election, with the possible exception of, ironically, DeLuca, who, according to Boehl, likely believed that Boehl supported him.[22]

Boehl cites to *Hall*, where the Seventh Circuit noted that where a plaintiff holds an "arguably prominent party office," a defendant's knowledge of the plaintiff's political activities can sometimes be inferred. 389 F.3d at 763. The plaintiff in *Hall* alleged that he was passed over for a new job with the Illinois Department of Transportation ("IDOT") by a three-member interviewing board, in favor of a fellow IDOT employee who was a "more zealous Republican." *Id.* at 760. The plaintiff had run for a county board seat as a Republican, served as treasurer of a county Republican

---

[21]      In denying defendants' motion for summary judgment in Douglas Foster's lawsuit, another court in this district was willing to infer that DeLuca was aware of Foster's support for Rees, based in part on the fact that Foster worked at Rees' campaign headquarters: "it is reasonable that DeLuca would have seen people leaving and entering Rees' offices . . . ." *See Foster*, 2006 WL 1980197, at *5. There was no dispute in that case, however, that Foster in fact had supported Rees and had worked at her headquarters. *See id.* at *2. Nor do Defendants dispute Foster's support for Rees here, or that he worked at her headquarters. (Def.'s 56.1 Reply ¶¶ 315-16 (disputing only that Boehl, Starkey, and Kenya Johnson worked at Rees' headquarters).)

[22]      The court notes that in a portion of her deposition testimony that neither party cites, Rees herself did not appear entirely certain of Boehl's support. She testified that Boehl "might have" supported her; she "believe[d]" that he did and "saw him at fundraisers," but "[h]e wasn't real active." (Rees Dep., at 74-75.) As noted, however, it is undisputed that Boehl in fact attended no fundraisers during the 2003 mayoral campaign. (Def.'s 56.1 ¶ 253.)

committee, volunteered for a phone bank on behalf of the Republican governor's campaign at the request of one of the defendants, and donated at Republican fundraisers. *Id.* at 761. The court was "willing to assume . . . that the facts support the inference that the defendants knew about [the plaintiff's] political activities," but held that the plaintiff's failure to show that a majority of the three-person interviewing board was aware of *both* applicants' political activities "doom[ed] his case." *Id.* at 763. The court noted that the Seventh Circuit has "sometimes assumed that a person's holding of an arguably prominent party office could support a finding of common knowledge among decisionmakers, and sometimes . . . [has] not." *Id.*

Boehl considers this language applicable here because DeLuca "was prominent in the Republican party." (*Id.* at 8.) Boehl misreads *Hall*, for it is the plaintiff's prominent position, not the defendant's, that the court noted can supply an inference that the defendant was aware of the plaintiff's political affiliation or activities. Moreover, the extent of the plaintiffs' political activities in *Hall*, and the cases cited there as examples, is far greater than Boehl's. In *Hall*, the plaintiff had engaged in numerous and prominent political activities as a Republican, of which the defendants, fellow Republicans, were likely to be aware. In *Garrett*, where the plaintiff, a city employee and candidate for councilman, traded public endorsements with the city's mayor, the jury was entitled to infer that the defendant, who challenged and defeated the mayor in the primary election, was aware of the plaintiff's support for the incumbent. 961 F.2d at 630, 632. In *Nelms*, the Republican plaintiff, an investigator in the Indiana attorney general's office, was terminated subsequent to the election of a Democratic attorney general. 153 F.3d at 817. Given the fact that the plaintiff had run for statewide legislative office as a Republican in the same election, there was a genuine issue of fact as to whether the new administration was aware of his political affiliation. *Id.* at 819.

Boehl does not assert that he engaged in a similar level of prominent political activity; to the contrary, he testified that he was "not real political." (Pl.'s Dep., at 170; Def.'s 56.1 ¶ 250.) Even if the court were to accept his assertion that he worked at Rees' campaign headquarters, this does

not amount to the kind of "arguably prominent" public political activity seen in the above cases.  *See Hall*, 389 F.3d at 763.  Boehl's case is more akin to *Cusson-Cobb*, cited in *Hall* as an example of where the Seventh Circuit declined to assume a defendant's knowledge of the plaintiff's political activities.  In *Cusson-Cobb*, the Republican plaintiff, general counsel to the Indiana Utility Regulatory Commission, was terminated after a new Democratic governor installed a Democratic chairman to head the commission.  953 F.2d at 1080.  Affirming summary judgment for the defendant commissioners, the court held that the plaintiff failed to demonstrate that the defendants even knew she was a Republican.  *Id.* at 1081.  The court rejected her argument that her party affiliation was "well known," noting that to survive summary judgment, she had to "show more than some blurry assumption" that the defendants "should have known she was a Republican."  *Id.*

Boehl's evidence on the critical issue of DeLuca's knowledge of his alleged political activities amounts to no more than a similar "blurry assumption."  Boehl essentially argues that DeLuca "should have known" of his alleged support for Rees.  *Compare Cusson-Cobb*, 953 F.2d at 1081. But as Defendants point out, Boehl assumed that DeLuca knew that Boehl was a registered Republican, and that Boehl voted for DeLuca in 2003.  (Def.'s 56.1 ¶ 256 (citing Pl.'s Dep., at 174).) Thus, to the extent Boehl argues that DeLuca should have known of Boehl's political activities, it is likely, as Boehl acknowledges, that DeLuca would have viewed Boehl as a fellow Republican and supporter.  Moreover, given that Boehl has identified no one who actually knew of his alleged support of Rees, it is unlikely that his support was so evident that DeLuca or anyone else should have been aware of it.

The court concludes that Boehl has failed to satisfy the "threshold question" of whether DeLuca was aware of Boehl's political activities. *See Hall*, 389 F.3d at 762.  As noted, there is scant evidence of Boehl's alleged support for Rees in the 2003 mayoral election; and even if that support in fact existed, Boehl has failed to present any evidence from which a reasonable jury could infer that DeLuca was aware of it.  Summary judgment is thus appropriate on Boehl's claim of political

retaliation.  *See Cusson-Cobb*, 953 F.2d at 1081; *Winkelman*, 173 F. Supp. 2d at 825.

### 3.    Boehl's Political Activity as a Motivating Factor

Because Boehl has produced insufficient evidence of his support for Rees and of DeLuca's knowledge of that support, the court need not determine whether that alleged support was a substantial or motivating factor in Defendants' decision to terminate him.  The court notes, however, that Boehl presents no direct evidence that political retaliation was a motivating factor.[23]  *See, e.g., Nekolny*, 653 F.2d at 1168 (defendant township supervisor's assistant told plaintiffs that defendant "wanted to terminate their employment because they had worked against her election").  Rather, he relies on inferences he urges can be drawn from the "patterns" of hiring, promotions, and terminations discussed above.

In the court's view, Boehl's "patterns" overstate his case.  He asserts that Christina Popolla, Kaz Rosetto, and Michelle Smado, whom DeLuca hired after the election, had not worked for Rees; but given that he does not assert that they supported DeLuca, it is not particularly probative that they, like presumably countless others, had not worked for Rees.  Similarly, the fact that DeLuca and Proft do not recall seeing terminated employees Marie Zerante or Licia Alcazar at DeLuca's headquarters, does not establish that they supported other candidates, or even that they did not support DeLuca.    What remains are Boehl's assertions that several alleged Rees supporters—himself, Douglas Foster, Stacie Foster, Deborah Harper, and Rita Starkey—were terminated, while DeLuca supporters Matt Fares, Harold Fosten, and Larry Prisco were either hired or promoted.  While the court need not decide whether such evidence, standing alone, is sufficient

---

[23]    In his statement of facts in his brief, Boehl cites to a portion of Douglas Foster's deposition in which Foster testified that DeLuca told him that he was being terminated because "people in [DeLuca's] organization . . . want . . . to chop off heads and hold them up as trophies." (Pl.'s Resp., at 3 (quoting D. Foster Dep., Ex. 2 to Pl.'s 56.1, at 307).)  Boehl does not cite to this testimony in his argument, and nowhere contends that DeLuca's remarks to Foster indicate that his *own* termination was politically motivated.  As noted, Foster's political retaliation claim against DeLuca and the City survived summary judgment, *see Foster*, 2006 WL 1980197, at *7, although the court in that decision did not refer to the above testimony.

for a claim of political retaliation to survive summary judgment, such evidence is unpersuasive where, as discussed above, there is little evidence that Boehl was a supporter of Rees, or that DeLuca believed he was.

### B.     Pretext

Because Boehl has not established a prima facie case, the court need not decide whether Defendants have demonstrated a legitimate, nonpolitical reason for Boehl's termination.  *See Hall*, 389 F.3d at 762; *Garrett*, 961 F.2d at 632.   The court notes, however, that a good deal of undisputed evidence supports Defendants' assertion that "Boehl was terminated in a City-wide reduction-in-force, and restructuring of the Public Works department where Boehl worked, in an effort to stem the City's deepening financial crisis . . . ."  (Def.'s Mem., at 10.)  Specifically, it is undisputed that Chicago Heights by 2003 was experiencing a significant fiscal crisis, due in large part to municipal employee salaries, benefits, and rising health care costs, (Def.'s 56.1 ¶¶ 38-39, 49); that City Treasurer Bauer had informed DeLuca shortly after he took office that the budget was $4 million short, and that Proft predicted a $4 million deficit as well for the fiscal year 2003-2004, (*id.* ¶¶ 61, 65); that the DeLuca administration believed that a large number of municipal employees held duplicative jobs, (*id.* ¶ 67); that the DeLuca administration determined that the work of the Public Works Department was duplicative of other departments and that the work could be absorbed by those other departments, (*id.* ¶ 75); that Douglas Foster's position as Director of Public Works was eliminated, as was Boehl's position as a supervisor in that department, (*id.* ¶¶ 80, 144; Pl.'s Dep., at 148); and that the City employed thirty-four fewer employees in April 2005 than in April 2003, saving the City between $1 and $2 million dollars.  (Def.'s 56.1 ¶¶ 226-27, 229.)

Boehl responds by citing evidence that in his view demonstrates that "his termination was not truly motivated by budgetary concerns by Mayor DeLuca."  (Pl.'s Resp., at 8.)  Specifically, he contends that DeLuca could have selected him, rather than DeLuca supporters Fosten and Prisco, to head a department after DeLuca's restructuring of the public works departments.  (*Id.* at 8.)

Boehl also argues that DeLuca could have merely demoted him, and points out that the City advertised for a foreman three months later. (*Id.*) Finally, referring again to DeLuca's alleged "pattern" of firing political opponents and hiring or promoting supporters, he asserts that DeLuca "hired many new people," and maintains that DeLuca "could have transferred many of the people he fired instead of hiring these new people." (*Id.* at 9.)

The court finds Boehl's arguments unpersuasive. According to Defendants, Boehl was terminated because his responsibilities in the Public Works Department were duplicative of other departments, and thus his position was expendable in light of Chicago Heights' fiscal crisis; the fact that Boehl was not then selected for other positions with the City does not suggest that either of those factors—his duplicative work, or the fiscal crisis—did not exist. Boehl does not dispute that the DeLuca administration considered the work of the Public Works Department to be duplicative, and had determined that the work could be absorbed by those other departments. (Def.'s 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.) In fact, Boehl describes himself as a "jack-of-all trades" whose duties as a supervisor largely consisted of filling in for other department heads and laborers when they were absent, (Pl.'s Dep., at 115-17); that description is entirely consistent with Defendants' characterization of his work as duplicative. His assertion that his job entailed "taking the reins and making sure the water, sewers, and streets were maintained the way the city wanted them maintained", (Pl.'s 56.1 ¶ 144 (citing Pl.'s Dep., at 135-37)), is too vague to suggest otherwise. Finally, and perhaps most significantly, it is undisputed that Boehl's position, like that of Director of Public Works Douglas Foster, was eliminated and never filled.

Similarly, the fact that Boehl was not offered a new position, either as a foreman or as Director of one of the restructured public works departments, does not indicate that his position as a supervisor was not eliminated for budgetary reasons. As noted, the parties dispute whether Boehl was offered another position with the City: Boehl asserts that Proft told him in his termination meeting that the City was "not hiring" for a foreman, (*Id.* ¶ 142), and Defendants assert that the

union would only allow Boehl to return in an entry-level position, which Boehl rejected. (Def.'s 56.1 ¶ 142.) Although the parties thus agree that Proft did not offer Boehl a position as a foreman, Boehl fails to counter Defendants' assertion that such a job was not available for Proft to offer. Boehl's assertion that a job posting for a street department foreman appeared in November 2003, (Pl.'s 56.1 ¶ 79), does not mean the position was filled, that it was filled with an external candidate, or that it was open when Proft advised Boehl of his termination on August 5, 2003. Nor does the fact that Prisco and Fosten were chosen to be Directors, suggest that the elimination of Boehl's position was a pretext; there is no evidence that either man had less seniority or experience than Boehl, or were otherwise less qualified.

Finally, lacking any direct evidence that Defendants' explanation is pretextual, Boehl again points to what he deems "patterns" of politically motivated hiring, firing, and promotions, and asserts in particular that DeLuca "hired many people" after the 2003 election. (Pl.'s Resp., at 8-9.) As noted, Boehl's "patterns" were unpersuasive in the context of making a prima facie showing that his termination was politically motivated; they are even less persuasive as evidence that the DeLuca administration's elimination of positions in the Public Works Department for budgetary reasons was a pretext for political retaliation. *See Garrett*, 961 F.2d at 633, 635 (plaintiff's reliance on the fact that the new mayor terminated supporters of the previous mayor and hired his own supporters, which was insufficient to show that political activity was a motivating factor in plaintiff's termination, was similarly insufficient to show that the new mayor's reorganization of plaintiff's department was politically motivated).

Boehl's assertion that DeLuca hired "many people," if correct, might indeed cast some doubt on Defendants' assertion that DeLuca was trimming the payroll for budgetary reasons. But Boehl identifies only eight new employees: Kaz Rossetto, Christine Popolla, Michelle Smado, Matt Fares, Glenda Gray, Nancy DiGiovanni, Joe Kurda, and Nazereno Leli. (Pl.'s Resp., at 9.) He offers no evidence that payroll expense for these new employees was higher than for terminated employees;

in any event, the new hires were more than offset by payroll reductions, as it is undisputed that the City in total employed thirty-four fewer employees by April 2005 than in April 2003, resulting in substantial savings.[24]  (Def.'s 56.1 ¶¶ 226-27, 229.)  Thus, DeLuca's hiring of these employees does not demonstrate the falsity of Defendants' contentions of fiscal concerns, nor does it at all indicate that Boehl's position in the Public Works Department was not duplicative of other positions. Moreover, there is no indication in the record that any of the eight new employees identified by Boehl, with the exception of Fares, (Pl.'s 56.1 ¶ 334), in fact supported DeLuca in the 2003 election. Finally, although Boehl urges that DeLuca "could have transferred many of the people he fired instead of hiring these new people," (Pl.'s Resp., at 9), he offers no comparison of the qualifications and/or payroll expense of terminated employees and the newly-hired employees.  In any event, any of these employees, including Boehl, "could be fired for a good reason or no reason at all, as long as [they] were not fired because of [their] constitutionally protected activities."  *Garrett*, 961 F.2d at 633.

## CONCLUSION

For the above reasons, Defendants' motion for summary judgment (23) is granted. Defendants' Motion to Strike Affidavit of Patty Rose (49), which document contained no evidence relevant to the court's decision, is denied as moot.

ENTERED:

Dated: February 16, 2007

REBECCA R. PALLMEYER
United States District Judge

---

[24]     The court also notes that Kurda and Leli were hired sometime in 2005, well after Boehl's termination.  (Bruni Dep., Ex. 2 to Def.'s 56.1 Reply, at 50-51, 66-67, 121.)